UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BEN E. FREEMAN, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Cause No. 1:10-cv-1431-WTL-DKL |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Ben E. Freeman requests judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying his application for Disability Insurance Benefits ("DIB") and Supplemental Insurance Benefits ("SSI") under Titles II and XVI of the Social Security Act ("the Act"). The Court rules as follows.

### I. PROCEDURAL BACKGROUND

Ben E. Freeman protectively filed for SSI and DIB on January 30, 2006, alleging he became disabled on January 23, 2006, primarily due to discogenic and degenerative disorders of the back and secondarily due to an affective disorder. Freeman was born on October 14, 1960, making him forty-five years old on the alleged disability onset date. After his application was denied initially and upon reconsideration, Freeman requested and received a hearing before an Administrative Law Judge ("ALJ"). A video hearing, during which Freeman was represented by counsel, was held by ALJ Gregory M. Hamel on September 16, 2009. ALJ Hamel issued his decision denying Freeman's application on September 24, 2009. The Appeals Council denied Freeman's request for review on September 15, 2010. Freeman then filed this timely appeal.

## II. FACTUAL BACKGROUND

In April 2004, Freeman was injured in a work-related accident while working as a mechanic. Immediately after the accident, Freeman was diagnosed with a lumbar sprain; he returned to work soon after his injury. Three months later, Freeman was diagnosed with a herniated disk by Dr. John Dietz, an orthopedic surgeon. In August 2004, Freeman underwent microdiscectomy surgery. Two months later, Freeman was permitted to return to work without restriction, but Dr. Dietz confirmed that Freeman would suffer some permanent impairment, diagnosing Freeman's permanent partial impairment rating of the whole body as ten percent.

In December 2005, Dr. Robert Bond, an internal medicine specialist, referred Freeman for an MRI because he was complaining of continued leg pain and weakness. A month later, Dr. Bond indicated that the results of Freeman's most recent MRI revealed two disc herniations. In February 2006, Freeman sought treatment from Dr. Scott Shapiro, a neurosurgeon, for his pain. Dr. Shapiro noted that Freeman presented with proximal bilateral muscle weakness in his hip flexors, deltoids, and extensor hallucis longus, and ordered Freeman to undergo an EMG to rule out more severe back conditions. Pursuant to Dr. Shapiro's recommendation, Dr. Marie Hake performed an EMG on Freeman in March 2006.

Soon after the EMG was conducted, Freeman had his initial evaluation at the Pain Management Center with Nurse Practitioner Susan Wood, FNP. Nurse Wood opined that Freeman's EMG results indicated chronic denervation of the left medial gastrocnemius and chronic L5-S1 radiculopathy. At his initial evaluation, Nurse Wood also observed that Freeman was unable to walk on his heels or toes and was positive for lumbar facet loading on the right and left, straight leg raise on the left, and SI maneuver on the right and left. Nurse Wood noted that Freeman reported that he was capable of conducting most of his daily living activities

independently, save for grocery shopping, and that he did not need an assistive device to walk. Nurse Wood diagnosed Freeman with lumbar facet syndrome, bilateral sacroiliac joint pain, low back pain with radiculitis of the left leg, depression, and postlumbar laminectomy syndrome, and she noted that Freeman's December 2005 lumbar spine MRI indicated a left L5-S1 disc protrusion that abutted his left S1 nerve root and severe right neuroforaminal narrowing at L4-L5.

Freeman visited the emergency room for his pain in March 2006, where examination revealed tenderness to palpitation and a positive straight leg test. A month later, Freeman received a cortisone injection in the course of treatment by Dr. Kashif Abdul-Rahman. In June 2006, Freeman received a lumbar epidural from Dr. Bradley Strausburg, of the Pain Management Center, which Freeman reported relieved his pain for approximately two weeks.

In April 2006, Freeman underwent a consultative examination under the direction of the Social Security Administration. During the examination, which was performed by Dr. M. Majid, M.D., Freeman demonstrated a normal gait but was only partially able to squat and walk on his heels and toes. His range of motion was somewhat limited in his lumbar spine. Overall, Dr. Majid concluded that Freeman "has chronic back pain, which appears to be mechanical secondary due to degenerative disc disease, which seems chronic progressive in nature. He needs to follow up with physical therapy and pain management. Expected duration with or without treatment is guarded." He further opined: "The claimant has no impairment to sitting, handling, seeing, speaking, or traveling. He has limitation to standing, walking and lifting heavy objects. He has no mental impairment. Memory and concentration are intact. As far as mental impairment is concerned, he would need psychological and/or psychiatric evaluation."

In late May 2006, Dr. Joseph Sands reviewed Dr. Majid's analysis and, without examining Freeman, completed a Physical RFC Assessment indicating that Freeman would have

frequent postural limitations of all kinds but that he could occasionally lift up to fifty pounds and frequently lift up to twenty-five pounds. Non-examining medical consultant Manjit Sihota reviewed Dr. Sands' Physical RFC Assessment and disagreed with the report only to the extent that Freeman's exertional limitations had been overestimated, indicating that it was more likely that Freeman could only lift 25 pounds occasionally and 10 pounds frequently.

In February 2007, a lumbar spinal MRI reflected a "focal disc protrusion eccentric to the left displacing the left S1 nerve root in the left lateral recess well with no evidence of significant foraminal stenosis." In July 2007, Bette G. Maybury, M.D., Freeman's treating physician, opined that Freeman's muscle stretch reflexes were diminished in his lower extremities, that there was decreased pinprick in the same, and that Freeman was "unable to appreciate vibratory sensation in the legs." Additionally, Dr. Maybury noted that, while she had encouraged him to look for work in which he would not have to do any heavy lifting or extensive walking, Freeman appeared to have a strong desire to work on his own but was unable to find steady employment. In December of the same year, Freeman underwent an arterial sufficiency study, which reflected essentially normal or minimally diminished distal perfusion in both legs.

In May 2008, Freeman was seen for leg and back pain by Dr. Ananda L. Kannappan. Dr. Kannappan noted the Freeman was out of medication at the time of his appointment and that an EMG failed to show neuropathy or myopathy, but Dr. Kannappan also found that Freeman had mild paraspinal muscle tenderness and again was positive for a left straight leg raise. Freeman presented for follow-ups with Dr. Kannappan in September and October 2008 and with Dr. Maybury in August and November 2008 and February 2009, where no significant changes in his condition were recorded. Freeman remained on medication for his pain throughout 2008 and 2009.

In July 2009, Freeman presented for a follow-up visit with Dr. Maybury, at which time Freeman complained of increased localized pain in his back and numbness and pain in his legs. Dr. Maybury noted that Freeman had decreased muscle strength in his lower extremities with "giveaway weakness due to pain" and ordered Freeman to undergo a lumbosacral MRI, which he did in August of 2009. Freeman's August 2009 MRI revealed small hemangiomas within several of his vertebral bodies. The MRI report also noted the following:

> Mild disc height loss and signal intensity is noted at the thoracolumbar and lumbosacral junction. Modic 1 partially enhancing degenerative endplate changes are seen at L5-S1 with L5 inferior endplate Schmorl node and left paracentral heterogeneously enhancing soft tissue. There is mild increase in the degenerative endplate changes at the same level compared to prior examination. The remaining intervertebral discs appear normal in height and signal intensity ending at L1 level. . . . [At] L4-L5 [t]here is mild disc bulging with facet/ligamentum flavum hypertrophy resulting in mild to moderate bilateral foraminal stenosis. . . . [At] L5-S1 [t]here is diffuse disc bulging with left paracentral enhancing soft tissue with low signal intensity in T1 and T2 sequences, posteriorly displacing the left S1 nerve root within the left lateral recess. There is mild enlargement and better defined margins compared to prior examination. This is suspicious for disc extrusion, however, postoperative fibrosis can have a similar appearance. There is mild bilateral facet hypertrophy resulting in mild bilateral foraminal stenosis slightly greater on the right.

### III. APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity he is not disabled, despite his medical condition and other factors. 20 C.F.R. § 404.1520(b). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits his ability to perform basic work activities), he is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in the national economy, he is not disabled. 20 C.F.R. § 404.1520(g).

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate his analysis of the evidence in his decision; while he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into [his]

reasoning . . . [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Id.*

## IV. **THE ALJ'S DECISION**

At the hearing, ALJ Gregory M. Hamel evaluated Freeman's claims and found that Freeman was not disabled under the five-step analysis set forth above. At the first step of the analysis, the ALJ found that Freeman had not engaged in any substantial gainful activity since the alleged disability onset date, as he had not been employed at any time after January 23, 2006. At step two, the ALJ determined that Freeman suffered from a combination of severe and non-severe impairments. Specifically, the ALJ found that Freeman's lumbar disc disease was a severe, medically determinable impairment because it caused more than minimal limitations on Freeman's ability to perform his work activities. After evaluating Freeman's mental adjustment disorder in the context of the four broad functional areas of (1) daily living activities, (2) social functioning, (3) concentration, persistence, and pace, and (4) episodes of decompensation, the ALJ also concluded that Freeman's medically determinable mental impairment of an adjustment disorder was not severe because it did not cause more than minimal interference with Freeman's performance of his work activities. At step three, the ALJ determined that Freeman's severe impairment did not meet or medically equal any of the listed impairments, and specifically did not meet or equal Listing 1.04.

Because ALJ Hamel found at step three that Freeman's impairment did not meet or medically equal any of the listed impairments, the ALJ next evaluated Freeman's residual functional capacity ("RFC") and determined that Freeman had the RFC to perform a full range of sedentary work. The ALJ then concluded at step four that Freeman did not possess the RFC to

7

perform his past work as a mechanic. At step five, the ALJ found that, because Freeman's RFC demonstrated that he was capable of performing a full range of sedentary work, a finding of "not disabled" was directed by Medical-Vocational Rule 201.19. Accordingly, ALJ Hamel concluded that Freeman was not disabled as defined by the Social Security Act.

## V. **DISCUSSION**

Freeman advances two objections to the ALJ's decision, each of which is discussed, in turn, below.

### A. **Listing 1.04**

Freeman argues that the ALJ's finding at step three that Freeman's condition does not meet or equal Listing 1.04 is not supported by substantial evidence. The ALJ's entire discussion at step three is as follows:

> Michael L. Blankenship, a vocational rehabilitation specialist, submitted a letter dated July 13, 2006, contending that the claimant's degenerative disc disease medically equals Listing § 1.04. However, Mr. Blankenship is not a medical practitioner, and there is no evidence to support the nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis with accompanying ineffective ambulation required under Listing § 1.04. In fact, the claimant was noted to be ambulatory when he presented to the emergency room in March 2006. Moreover, a consultative examination report, dated April 27, 2006, indicates that the claimant was ambulatory without assistive devices.

Record at 16. The ALJ is correct that Mr. Blankenship is not qualified to determine the medical question of whether Freemen's condition meets or equals the Listing. However, neither is the ALJ, and the ALJ fails to point to any medical opinion to support his step three finding. As set forth above, there is ample objective evidence that Freeman has some sort of nerve root problem; it is described as being "abutted" and "displaced." Whether that is the same as or similar enough

8

to being "compressed" such that Freeman satisfies Listing 1.04 is for a physician to say.[1]

The Commissioner argues that there is substantial evidence of record to support the ALJ's finding at step three; specifically, the forms completed by Drs. Sands and Sihota in which they opined that Freeman retained the RFC to perform medium work (Dr. Sands) and light work (Dr. Sihota). It is true that these types of forms can provide the necessary medical evidence to support a step three finding. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) ("These forms conclusively establish that consideration by a physician designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review. The ALJ may properly rely upon the opinion of these medical experts.") (citations omitted). There are several reasons why that is not the case here, however.

First, the ALJ did not point to the opinions of Drs. Sands and Sihota in making his step three determination, and therefore those opinions cannot be used to support that determination after the fact. *See Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) ("But these are not reasons that appear in the ALJ's opinion, and thus they cannot be used here.") (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010); *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir.2009)). Second, the ALJ expressly *discredited* the opinions of Drs. Sands and Sihota, finding that "[t]heir opinions are overly optimistic in light of clinical and laboratory findings." Record at 18.[2] And, finally, Dr. Sands and Sihota expressed their opinions

---

[1]The Commissioner argues that treating physician Dr. Maybury "declined to opine that Plaintiff met or equaled listing 1.04" in response to an interrogatory sent to her. Actually, her answer with regard to whether Freeman's condition is equal to the listing is ambiguous; it certainly does not constitute evidence that the listing is equaled, but neither does it support the finding that the listing is not equaled.

[2]Actually, the ALJ's decision refers to "[s]tate agency doctors A. Dobson, M.D." who, he says, "opined that the claimant can lift 50 pounds occasionally and 25 pounds frequently, sit,

9

without the benefit of approximately three years of additional medical information that suggest that his condition was worsening over time.  Significantly, this is consistent with consulting physician Dr. Majid's opinion in 2006 that Freeman's condition was "chronic and progressive."

The ALJ did not point to substantial evidence to support his determination that Freeman's condition does not meet or equal Listing 1.04.  On remand, he should obtain a medical opinion on this issue–from a medical advisor or otherwise–that is based upon all of the available medical evidence.

**B.  Credibility Determination**

Freeman also argues that the ALJ failed adequately to articulate his application of SSR 96-7p when he determined that Freeman's statements regarding his pain were not credible to the extent that they were inconsistent with Freeman's ability to perform a full range of sedentary work.

Because the ALJ evaluates credibility by questioning and observing a live witness, rather than reviewing a cold record, an ALJ's credibility determination is reviewed deferentially and should be overturned only if it is "patently wrong."  *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).  However, "[t]he determination of credibility must contain specific reasons for the

---

stand or walk for a total of 6 hours in an 8 hour day and unlimitedly push and/or pull."  Record at 18.  While the ALJ mentions only Dr. Dobson, he then refers to "their opinions" as being overly optimistic.  The ALJ cites to two exhibits in the record:  Exhibit B8F, which is the Physical Residual Functional Capacity Assessment Form completed by Dr. Sands on May 18, 2006, and Exhibit B13F, which is a "Case Analysis" dated August 29, 2006, and which in its entirety consists of the following statements:  "I have reviewed all the evidence in the file and the decision of (6/20/06) is affirmed, as written.  A.M. Dobson, MD" and "I have reviewed all the evidence in the file and the assessment of (5/18/2006) is affirmed, as written. A.M. Dosbson [sic.], MD."  It thus appears that Dr. Dobson is purporting to "affirm" both a physical assessment (dated May 18, 2006) and a psychological assessment (dated June 20, 2006). This document is wholly unhelpful, as it does not identify what the specialty of A.M. Dobson (or Dosbson) is and why he or she would be qualified to speak to both physical and mental issues.

credibility finding . . . [and] must be supported by the evidence and . . . specific enough to enable the claimant and a reviewing body to understand the reasoning." *Id.* (citing *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007)).

> The reasons for an ALJ's credibility determination must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

*Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003) (quoting SSR 96-7p). Further, with regard to subjective symptoms such as pain, the regulations provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 404.1529(c)(2). This is because "[t]he etiology of pain is not so well understood, or people's pain thresholds so uniform, that the severity of pain experienced by a given individual can be 'read off' from a medical report." *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006). Therefore, when evaluating the credibility of an individual's statements, "an ALJ must consider the entire case record and give specific reasons for the weight given to the individual's statements. In other words, the ALJ should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and functional limitations." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (internal quotation marks and citations omitted).

In this case, the ALJ found that Freeman's impairments could reasonably be expected to

11

cause the pain and other symptoms he alleged, but then determined that Freeman's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" the ALJ's RFC determination. The Court agrees with Freeman that the ALJ's explanation for this finding falls short. Other than a summary of the objective medical evidence of record, the ALJ's credibility analysis consists of the following:

> Despite the claimant's contentions that he can only sit for 5 or 10 minutes, the claimant sat during his hearing, which lasted approximately a half-hour. Moreover, the claimant's activities of daily living include independent personal care, driving, shopping with is ex-wife, cleaning, cooking, doing laundry and exercising on a bike, which are suggestive of the claimant's ability to do sedentary work. He also smokes against medical advice and random urine drug screens have revealed positive laboratory findings of opiates.

There are several problems with this "reasoning."

First, the nurse practitioner who ordered the drug screening in question noted that Freeman reported that he was taking Vicodin, which is an opiate, as prescribed for his pain, that he had been taking it for two years, and that he denied taking any other drugs. Therefore, the fact that he tested positive for opiates (and only opiates) actually bolsters Freeman's credibility – the drug test showed that what he had reported to the nurse was entirely accurate. The ALJ was patently wrong when he pointed to the drug screening results as evidence of Freeman's lack of credibility. The Court also is perplexed at how smoking against medical advice relates to credibility; it is certainly unwise, but not at all dishonest.

In addition, Freeman did not testify that he "can sit for only 5 or 10 minutes," but rather that he could do so "in reasonable comfort." Further, the record indicates that the hearing did not last "approximately a half hour," as the ALJ states; rather, it lasted 19 minutes. So taking Freeman's testimony literally, he spent the first 5 or 10 minutes of the hearing "in reasonable comfort" and then was uncomfortable for the remaining 9 to 14 minutes. It is not clear to the

12

Court what types of signs of discomfort the ALJ expected to see during that short time, or even how much of an opportunity the ALJ would have had to make such an observation, especially in light of the fact that the hearing was conducted via video and the ALJ noted the following at the beginning of the hearing: "I type my notes, so if I look away it's because I'm just looking at a screen nearby here."

Finally, the fact that Freeman engages in the daily activities noted by the ALJ is not at all inconsistent with his allegation of disabling pain. *See Carradine v. Barnhart,* 360 F.3d 751, 755 (7th Cir. 2004) (chastising ALJ for failing "to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week").

"[A]n administrative agency's decision cannot be upheld when the reasoning process employed by the decision maker exhibits deep logical flaws." *Id.* at 756. Such is the case with the ALJ's credibility determination in this case. On remand, the ALJ should reevaluate his credibility determination and articulate reasons for his finding that actually are supported by the record and that actually are indicative of Freeman's credibility.

## VI. CONCLUSION

For the reasons set forth above, the Commissioner's decision is **REVERSED** and this case is **REMANDED** for further proceedings consistent with this decision.

SO ORDERED: 12/05/2011

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification

13